Your Honor, the first case of the night this morning is 2-23-0062, the people of the state of Illinois, Plaintiff, v. Frank Weinstein, et al., defendants, athletes, Illinois Department of Human Services, appellants. Arguing on behalf of the appellants, Mr. Benjamin F. Jacobson. Arguing on behalf of the athlete, Mr. John W. Kondosovich. Thank you, Mr. Jacobson. You may proceed. Thank you, Your Honor, and may it please the Court, Assistant Attorney General Ben Jacobson on behalf of Appellant, Illinois Department of Human Services. Civil contempt proceedings have very specific requirements and are intended to address specific kinds of problems. The circuit court erred here because those requirements were not met and the issues that we have here are not the kind What was not met, specifically? At both steps of the contempt analysis. At the first step, there was no specific mandate in the unfitness orders that was violated by the department. Aren't you governed by the statute? We are governed by the statute, Your Honor, but contempt only addresses noncompliance with a court order. So while a court order could incorporate explicitly a requirement that's in a statute. Does the court have to tell you that there's a statute that governs your conduct? The court doesn't have to tell you that for you to be operating under the statute, but in order to be held in contempt of court, which is a narrow proceeding that has specific requirements, there has to be a mandate in an underlying court order that you have violated. Why don't we have the transcripts of the hearings that produced the orders to compel? So, Your Honor, those transcripts are irrelevant to the merits of what we're dealing with here. Why? As we see in In Remarriage of Latour cited in our brief, the hearing on a petition for the rule to show cause just results in the court issuing that rule. And that just brings the contempt proceedings before the circuit court. So all that matters is that the rule is issued. And so the rule is issued. We don't need to know the arguments that were brought, because the merits of the contempt are then, you know, the evidence is brought at the evidentiary hearing and the merits of contempt are argued at that merits hearing. This appeal is based upon a question or questions of law. And I say that because if it isn't based upon a question of law, but based upon a mixed question of law and fact or on elementary facts, then why isn't there a transcript of the proceedings? So, Your Honor, there are transcripts of the evidentiary hearings and the hearings at which the parties argued the merits of the contempt before the circuit court. We just don't have, excuse me, we just don't have transcripts of that initial presentation to the court. Take a moment. We just don't have transcripts of that initial hearing on the issues of the rule. And as I said, in marriage of Latour cited in our opening brief, we don't need the transcripts for that hearing. In other words, you're not fouched. You're not. No, there's no fouch issue here. Thank you, Your Honor. Okay. What about the defense of impossibility? That was not really raised, right? I mean, how could the department have complied with the orders without the staff necessary? So I think that's exactly right, Your Honor. I think that the — But you didn't raise the impossibility as a defense. So I think there's, in the context of contempt, that is usually phrased as unable to comply as opposed to a defense of impossibility. And so that was one of the main issues raised by the department at that second step of the contempt analysis. Because, as you said, without the staff to add additional beds or to provide comprehensive treatment that these defendants need and that they've been ordered to be given, the department can't take them into its custody. And so without the ability to take them into its custody, it cannot comply with the order. I know in your brief you set out some of the steps the department took. Were there meetings with the governor's staff to basically say this is an urgent need? Did the department take any steps to do that? I don't know to the extent that there were meetings or not. I do know that the governor's office was behind the department in ensuring that there was sufficient funding to hire the people that were needed. So as Dr. Coleman stated in her testimony in the Bradas Alvarado hearing, it isn't a funding issue when it comes to hiring additional staff. It's a willingness of individuals to come and work and take these jobs that are being offered. And so the department has tried a number of things. It has raised salaries, as the circuit court indicated would be a way to solve this problem. It has raised salaries. It's engaged in very aggressive hiring practices. In particular, I think if we look at the declaration of Dr. Coleman again that was originally submitted in the Bradas Alvarado case and then stipulated in Clark and Sebesta, there were a number of hiring events in the relevant period here, which is roughly November 2022 to January, February 2023. I believe there were three or four hiring events that were held, like in-person hiring events. And then the department was also holding four, I believe four virtual events a month to make people aware of positions that were available. The department was posting ads in a nursing magazine for the Illinois Nurses Association that came out every quarter. And so the department was doing what it could to try and resolve the staffing issue. But as all of the department witnesses testified, all three doctors, there's a nationwide shortage in health care staff, and particularly with mental health care staff. Has the new legislation undercut your arguments to the extent that it seems that the new legislation opens up avenues to allow you or your agency, not yours because obviously you're the DAG, but how do you reconcile what the legislature have done to ease the responsibilities of the agency vis-a-vis what it was before the amendments? So, Your Honor, I think it's a recognition by the legislature that the statute as it existed at this time hadn't accounted for this situation where the department is overwhelmed by referrals and doesn't have the capacity to take in all of these defendants and provide them the treatment that they need. And again, we're talking about the narrow confines of a contempt proceeding here. And so what we're considering here is what was the specific mandate in the underlying order, the unfitness order, and if that mandate was not complied with, was the department's conduct intended to embarrass the court, hinder proceedings, that kind of thing? Well, it did hinder proceedings significantly. But it has to do with what the intent of the contender is. Well, what was your intent then? The intent was, as we see through Dr. Marano's conduct in pre-evaluating and monitoring and then also through all of the efforts to bring in additional staff and expand facilities, work with third parties, we see an intent to try and speed the process up as much as possible. I see your argument. But how do I reconcile that with an admission that this has been going on for 10 years? So there's kind of two parts to that, Your Honor. I think the kind of preliminary thing is that with the willfulness argument, we can only consider the contender's conduct from the time that the unfitness order is entered. But doesn't that go to intent? You're suggesting that that impossibility is your defense, but it has to be viewed in the context that you raise it. Yes, it could, Your Honor. This impossibility dates back 10 years, and yet no evidence of what you've been doing to rectify that other than this last 60 days, the operative 60 days, to the extent that there have been delays in placement going back. It's not just delays in placement. It's not in-person evaluations and a lot more than just the placements, correct? Well, I don't think so, Your Honor. Based on the record that we have here, the lack of in-person visits, that really was from July 2020 through January 2023, because the reason that there weren't in-person visits was because of the pandemic. So the in-person visits were paused in, I would assume, March of 2020. And then it wasn't until about July of 2022 that things started opening up again and in-person visits were possible. And it's important to note that Dr. Marano started with the department during the pandemic. So she started when there were no in-person visits. Does the statute provide either authority or the discretion to postpone any treatment or analyses or reporting until the individual is placed in their final location or the facility that they're supposedly going to be treated at? So as the statute existed at the time here, there is no, I believe, explicit authority for delaying that treatment or analysis. However, when the provision of that treatment and evaluation is impossible because the defendants can't be brought into the department's custody  Wait a second, if I may interrupt. Yes, of course. Are you suggesting that this report or the analysis of what the treatment should be couldn't be done before the person was actually in the custody of the department? Yes, Your Honor. And I believe there was significant testimony about that from Dr. Coleman in particular, but also from Dr. Marano and Dr. Barczyk. That evaluation process is a multidisciplinary process that requires a whole team to come together and conduct that evaluation. And given the staffing issues that the department has, at the time it was having difficulty even having staff to treat a defendant in every single bed that the department had available because we saw the department added, I believe, 44 beds at Elgin. But here's the point. If you know we have these additional staffing issues, change the process. Make an attempt to facilitate speeding this up through other avenues. I didn't hear any evidence of that. Well, there's, again, kind of two aspects to that, Your Honor. On the one hand, I think we do see things that were changed in the process overall. One of the big things that we heard changed is that all staff evaluations that were being conducted of defendants that were currently in the department's custody were increased from, I believe, monthly to weekly. And then the all staff evaluations that were done at the department level for all six facilities covering all 102 counties, those were increased from quarterly to monthly. And so that was one way that they could more quickly identify defendants who were ready to be stepped down to a different facility or released. But that just creates more beds. But you keep saying that beds is not the answer. Only staffing is the answer. Well, so in addition, Your Honor, there's also… If you need a minute… Thank you. Thank you. In addition, Your Honor, as I've discussed, there's all of the hiring practices that were changed, all of that. Which brings me back to the question I asked you, although I appreciate your answer. You know you have staffing issues, and yet you continue to say we cannot do evaluations unless we have the person in custody. You didn't change that, which, based on your argument, would have made a difference, or a significant difference. So if there aren't staff to conduct those in-jail evaluations, then the one way to resolve that problem is to hire the staff to allow for that. Okay. And in addition, Your Honor, I think the willfulness… Would you like me to finish? The willfulness analysis doesn't look to whether the contender chose the most effective method. It's whether they were trying methods that were intended to resolve the issue. Intent, of course, is in the eye of the beholder, not the person making the argument, though, correct? In a sense, Your Honor. But I think INRI J.S. is the case to look to for that. Any more questions? No. I have one or two. Thank you, Your Honor. Am I correct in concluding that your argument is that the statute was unclear and ambiguous? And since there was no definitive order entered by the court requiring certain dates as determiners of when things were supposed to get done, that the department is not in contempt? That is one of our arguments is along those lines, Your Honor. It's that the order did not contain a specific date certain that the defendants were supposed to be placed and treated. And so contempt can't lie because there was no specific mandate there that they had violated. And, again, with the statute, because we're in a contempt proceeding, whatever requirement was in the statute cannot lie as the basis for contempt. Do you think the legislature intended the interpretation that you are ascribing to the statute? The interpretation that the department does not need to take a defendant into its custody by a date certain, Your Honor. Or do reports by a date certain or do anything by a date certain, as long as the department determines that there is either it's too difficult or it's impossible, then it shouldn't be held in contempt. There's kind of two elements there. I believe that there are certain portions in the statute as it existed that did have timelines on them. There is that 30-day report. There's a 60-day report. There's a 90-day report. And so I think the legislature certainly intended that those deadlines be met. But, again, Your Honor, I think in the contempt context, if we're talking about just that first stage, that first stage of the analysis, whether we are to reverse the trial court's findings for holding and punishment of the fine for noncompliance, does it have to be on merely one aspect of the order? Or does the entire determination or judgment have to be completely erroneous in order for us to reverse it? I think if any one of the errors that we've raised, that would be a sufficient basis. Where I'm going to or where I'm coming from is that there was a timeline. And based upon that timeline, there were things that weren't done that I believe the trial court was suggesting it should have been. And so if any one of those things was not done and was grounds for a finding of contempt, then why would we not affirm as long as there was at least one ground that was sustainable? So at that first step, I think there's the one ground of the 30-day report that was explicitly incorporated into the unfitness orders. Even if there's noncompliance with that aspect of the unfitness orders, you still have to have a willful and contumacious. You still have to what? The contender still has to have willfully and contumaciously violated that order. The noncompliance has to have had that intent. And I think once, even if we get to that point, then the fact that there was an impossibility, an inability to comply here due to the systemic issues that were preventing the department from taking the defendants into custody, there was no willful and contumacious conduct here. If you don't feel at ease answering this question, that's fine. But if I understand the basis or the kernel of your argument, then a petition for writ of mandamus would not lie in this situation. Is that correct? You know, I don't want to give a definitive answer because it's not something that I have looked into. And based off the top of my head, I think the law is that mandamus won't lie if you're asking them to either exercise discretion or do an impossible act, i.e., if a clerk is supposed to issue a marriage license for people of the same sex. For a long time, that was considered impossible to do or unauthorized by law. Contrary to law. Yeah. Perhaps, Your Honor. I, you know, I think that I don't know if there are differences in what impossibility and inability mean in these different contexts. But I, you know, to the extent that they would be the same, then I think perhaps that might be the case. Okay. Thank you. They'll have an opportunity to make rebuttal. Thank you. Mr. Rabasovich, you may proceed. Thank you. Good morning, and may it please the Court. My name is John Rabasovich on behalf of the appellees. The department makes essentially three arguments. They say that, one, there was no deadline in the order, and that the court committed a legal error because it held them to compliance with the statute. And when contempt requires an order. And their final argument, essentially, that the delays in the placement and treatment were outside of its control. And they're saying that that goes to their intent. I'd like to start with discussing the order that the court entered. In each of the cases, it was identical. After finding the respective defendants, criminal defendants, unfit due to a mental illness or mental disorder, it ordered them transported and placed in the custody of the Department of Human Services, who had to do two things under the order. It had to, A, determine the appropriate placement, and B, provide the appropriate treatment for the defendant. And then in paragraph three of each of the orders, it says, the department shall, within 30 days, indicate an opinion as to the probability of the defendant attaining fitness within a period of one year from today's date. Now, the order at issue is, I suppose, intimately intertwined with the fitness statute, with section 104.17 of the Code of Criminal Procedure. The portion of the court's order that dealt with determining the appropriate placement derives directly from paragraph B. Did the, I think the name is Marcano. Did that psychiatrist or psychologist have the ability to make the determination as to whether or not the person would be rehabilitated within a year? I don't know if she had that capacity or not. But certainly, if she's making the determination, certainly she made the determination that there was an appropriate, where the appropriate placement was. But there's… Well, my point is, is that sometimes the cart doesn't come before the horse. And I don't know how you can opine as to whether or not somebody's going to be rehabilitated within a year if the person isn't in the facility that they were going to be assigned to and the full panoply of tests were given to come to an opinion within a reasonable degree of psychiatric certainty as to whether or not they would or they would not be rehabilitated within a year. So if Marcano doesn't have the ability to do so, then who does? Apparently, the person that does is the person who's going to examine the respondent in the institution that they're supposed to go to but haven't been assigned to yet and so on. So how are they going to do this within 30 days? Well, I think there's two parts to that. First, we have to remember that at the point that fitness is, when a criminal defendant's charged and fitness is raised, there's a bona fide doubt that the court finds. There's an evaluation that's ordered as part of that evaluation. The county evaluator has to make an opinion, has to render an opinion as to whether the person could be restored to fitness within a year. That goes to a hearing in front of a judge. That happened in all of these cases. And the judge had already said that that is the opinion of at least one of the psychologists. Now, the question is whether the department has a different opinion. And the statute says, well, if you have a different opinion, you can tell us and you can tell the circuit court, and then they have to hold a hearing within a certain time frame to consider that evidence. Otherwise, the status quo at that point is that the person can be restored to fitness within a year. And so when Dr. Marano was making that initial assessment, and by the way, she was doing it via phone. She was literally phoning it in and sending emails. She wasn't even contacting the person in person. So if the question is whether Dr. Marano could do it, probably not. But certainly, certainly the statute requires under subsection E that the person supervising the defendant's treatment is supposed to file with the court a report assessing either the facility's or the program's capacity to provide the appropriate treatment for the defendant and to make that indication of whether or not they could be restored to fitness within a year, the probability that they're going to be restored to fitness within a year. So does the statute say anything about once there's a determination of what institution or institutions the individual is to be assigned to shall be assigned and transported there? It does. In subsection B of the statute, there's the placement order that the department has 20 days to make a placement decision. They're to then notify the sheriff who's supposed to transport them forthwith. If they don't notify the sheriff, sheriff's supposed to contact them. If they do notify the sheriff, there's – so it's essentially 20 days. And I think when the statute was passed, it's contemplated that within 20 days, they're going to determine the facility. They're going to get them there within the next – between that 20-day mark and the 30-day mark. And then on the 30-day mark, the department's supposed to render its opinion. So would that be in contempt of court if they failed to do that? I don't know. I don't know on these facts that that would be contempt of court for the following reason. Subsection B of the statute at the time said that it places the duty to transport the defendants to the department. It makes – it says the sheriff's supposed to do it. It doesn't say the department shall receive. Were there ongoing communications between the department and the sheriff's office as to why they could not transport? I don't know what the record discloses that. What it discloses is that there was not a bed available and so that they weren't going to – they wouldn't transport them. The sheriff isn't going to – I mean, under subsection B, the sheriff could tell them we're going to drop them off at the closest geographical facility unless you tell us not to. And then there's two-day provisions that kick in at that point. You seem to be basing your analysis on the number of beds available as opposed to the staff available. And insofar as transportation is concerned, how does the staff available relate to transportation to the facility vis-a-vis whether or not there is a bed or a cot or some place for this individual to reside during the evening hours? Well, there's – I suppose that's – the statute then and now under the revisions provide that the defendant remains in the county jail pending that transfer. So there is a place for that person. My – the gist of my question is, is the basis for the transportation a – based upon the number of beds available or not available? Is it based upon solely the staffing available? Or is it based upon a combination of the two? I would – the statute doesn't discuss that. Our subsection B, it doesn't discuss that. It just says within 20 days. It doesn't discuss staffing. What was the reason or excuse given by the agency? The agency said they didn't have the beds available. But they didn't raise the argument that they didn't have the staff relative to transportation. They may have raised it relative to treatment and prognosis and whatever. But I think they actually raised it more directly as – in respect to transport. That they didn't have the staff available. That there was evidence that – that they had opened one facility, repurposed an existing facility, gained 44 beds, but there were only 16 individuals placed there because they didn't have the staff to staff that. So we're talking about staff that deals with the occupancy rather than the treatment of the individuals. That's true. But there was also testimony adduced. I believe it was Dr. Barczak, that the primary mode of treatment is medication, is medicating the person. There's also an educational component and there's staffing that happens. Is talking about a bed, is that a euphemism for something that I'm not aware of? I just think it's an availability. You say that a bed is not available. Does that include other things other than the literal statement, there is not a bed in existence like St. Augustine's chair? Yes, I think that is correct. Is there something beyond the mere existence of a bed for this person to lay on? Yeah. In the connotation of there aren't enough beds. Certainly. However, the notion that treatment can only begin once the person is transported to that bed is a misnomer. Because there was evidence in the record that the primary mode of treatment is medication because the jail houses the person, so there's a bed in the jail. The jail has a mental health staff that the department didn't even attempt to communicate with. And the department employs psychiatrists who can prescribe medications. Bear in mind, there's the report, the fitness report, with a certain diagnosis. If a psychiatrist had visited them in the jail and reviewed the records, they could have made a determination to begin at least medication. Had the department done that, had the department done that one minimal step, I don't know that we would be talking about contempt because then the treatment. They're trying. They were trying. And, Justice, the treatment would have then begun within the 30 days. You would have had someone supervising the treatment, the prescribing physician or psychiatrist, that treatment would have commenced. They could have complied with the 30-day report to not just apply it as to the probability, but the program's capacity to provide appropriate treatment. They could have said, we have commenced treatment. We have begun the medication portion. We do not have a bed and the staff available at a facility to bring in full treatment, to bring in the educational components of restoring someone to fitness and that's tailored to their unique needs. We will be able to do that within the next six months given our wait list. And so there is a probability that they could attain fitness within a year. That report could easily have been generated. But the department said, both through Dr. Barczyk and Dr. Rano, we don't do that. We don't consider that until the person arrives at our facility. And so what they did, yes, there is this backlog. Yes, this backlog has existed for the past 10 years. No, the pandemic didn't prevent Dr. Marano or anyone else from going to the jail in person. That was refuted. Deputy Chief Koff has denied that he told Marano not to come. He denied it. He also denied that there was a policy that you couldn't come in person. I know this is outside the record, but I'm a criminal defense attorney. I visited clients in person throughout the pandemic. There was no such policy. And so the department would argue that in order to prescribe medication, you have to see a person and evaluate them physically in person, right? Well, they could have gone to the jail. Had they done that simple step, we would be talking about a different situation. They didn't do that, and they said we won't do that. What they did with Dr. Marano, who was making these phone calls and emailing group emails, not even individualized to the person. Let's step back and think about this. We have mentally ill individuals in a county facility where the testimony was that the psych services division of that jail was not as robust as it is in other counties. And so they are decompensating in the jail. While criminal proceedings are, meanwhile, they're stalled by statute, nothing can occur on the criminal case. They're simply getting worse in the jail. They can't communicate with their attorney. That's what competency or fitness means. And so what is Dr. Marano reporting back to the department? How big has the fire gotten? How big has the fire gotten? Is this person really good? Are they bad, or are they really, really bad? And where can we get them in to a different bed? That's not compliance. That's not even an attempt to comply with the court's directive to provide treatment. That's kicking the can down the road and having someone out there holding a flag saying, yeah, this is really bad, and now we've got to get them in. The department relies on NRAJS. Can you distinguish that? Sure. NRAJS, there's a couple ways to distinguish that. First of all, the court in NRAJS was the circuit court found that DCFS had ignored the court's order. That was the contempt finding, and the opinion actually quotes that. In each of the contempt orders and then in its ruling, it found that significant, that it said it ignored it. When DCFS was making ineffective but efforts to place juveniles with third parties who kept rejecting them, and in each case they considered, or not just considered, but attempted several placements that were rejected by third parties, by someone outside. That's not the case here. The court didn't say that they ignored it, ignored the order. The court said that they didn't provide the treatment that was ordered in paragraphs one and three, and this was wholly within the department's control. It's wholly within the department's control. I know that the department made an issue of considering conduct that predated the entry of the orders. The department introduced all that evidence. We're talking about decreasing in staff levels. We're talking about the pandemic. We're talking about an increase in referrals in 2022. All this predated the conduct at issue. It's just the background of what's going on. And so the fact is that the department is the one who, it's not, they can't point to a third party. And frankly, if we want to point to third parties, they should have considered Westford or Liberty Healthcare. There are many psychiatric services who have staff who contract with jails to provide psychiatric services in a jail. If money wasn't an issue, they certainly could have done at least that. And the court found that they should have done something more. The question on Wilkins, is that a subjective or an objective determination? I believe, I think it's objective in this sense, Judge. Okay. Intent doesn't matter. The, I'm sorry, I forgot the name of the case. Ward 5 Roofing, that's a Supreme Court case from the 50s that we cited. It says intent doesn't matter. What we're looking at is we're trying to coerce compliance with something that's ordered that someone didn't do. And then you look at the efforts that they made and whether those show that they're noncompliance with that statute as well. But is it an objective standard to look at the efforts? In other words, is it efforts from the contemptor's perspective or from the binder of facts? It's the binder of facts determination. I'm sorry, Judge. I didn't understand a subjective objective. And I have no other questions. Thank you. Okay. Thank you, sir. Thank you, Your Honor. Mr. Jacobson, you may proceed with rebuttal. Thank you, Your Honor. To reply to the last thing first, Cook County, the Lloyd Fry case that my colleague was just discussing, that was dealing specifically with an agreed order, noncompliance with an agreed order. And in that context, the intent doesn't matter because the party has already said we are capable of doing this. And if we look at the cases that have cited, relied on, or distinguished that case in the years since, I think it's from 1974, they have all relied or distinguished on it on that basis. So it's not relevant here. What's the definition of intent? Intent is what does the party want to accomplish. And is that, do we look at all the circumstantial evidence surrounding that or just take your statement at face value? No, no, Your Honor. I think you look at all of the context of it. And I think the contempt, the willfulness standard explicitly requires you to consider the context of the party's conduct. And the context here is that the department was facing an increase in referrals that went beyond its capacity. And to go, Justice McClaren, to several of the questions that you were asking regarding what is a bed, I think it's, it means, you know, the space available both to house and treat the defendant. As my colleague pointed out, you know, about 44 beds were added at Elgin in late 2022, early 2023, but only 16 of them were able to be filled because there weren't staff to provide the. Do you have the authority for that definition? I do not have any authority. That's your perspective of what that term means and how it was, what it meant when it was used. Talking about the intent, Your Honor? Beds. Beds. Oh, no, I think if we look to, you know, I don't have a specific site for you in the record. But I think if we look to, you know, more generally to the testimony from doctors, Bartrack and Coleman in particular, I know that this will be detailed in our brief. So your perspective is we should read through their testimony and sort of pull out that's what they mean? No, I think what they say, they had explicitly said we added these beds, but we didn't have the staff to provide. My question is, when you say beds mean a spot and staff to treat, where is that in the record? It seems to be, with all due respect, sort of your perspective on that term. My question is, is there anything in the record that would have led the trial court to consider that that was the definition of a bed? I'm not sure, Your Honor. I don't have a specific site for you. I think it is an inference. It may have been explicitly said there. And, again, we may have said that in our brief, but I don't have that specifically off the top of my head. Can you respond to counsel's argument about NRAJS and why it doesn't apply here? Yes, Your Honor. You know, of course the facts of every case are going to be different. The circuit court there did make that explicit finding of fact regarding the Department of Children and Family Services. They're ignoring the placement orders. But the core element of what the court was addressing in NRAJS was whether or not the contender was making efforts to comply and whether or not they were prevented from complying by factors outside of their control. And the families that they were trying to place these children were rejecting them, so there was a third-party component. You don't have that here, do you? We don't have a third party rejecting, but we still have factors that were preventing compliance. What about counsel's argument that there could have been an attempt to visit these inmates in the county jail by a psychiatrist who could have prescribed medication, and so the treatment could have begun, even though the department didn't have, quote, unquote, the beds as you described them? So Dr. Coleman testified to this. This goes back to kind of the multidisciplinary team that you need to make that initial diagnosis assessment of what treatment. Counsel, with all due respect, you give us this circular argument. Why can't you do something else when we don't have the staff? We don't have the staff because we won't try alternatives. As counsel raised, too, why not contract with other agencies? You said the governor is giving you more money than you need. It was not a financial issue. Why not contract with outside services? So first of all, Your Honor, to contract with third parties, all of these solutions are things that take time. Was there any steps taken to undertake that, anything you can point to in the record? So there were no steps taken to have third parties provide that assessment and treatment in the jail. Anywhere? Not that I'm aware of. Certainly not here at Lake County at issue in this case. But again, one of the things that the court in Henry J.S., if I may finish, in Henry J.S., is that the court was very explicit that we're not looking at whether or not the contender chose the most effective. In hindsight, with 2020, we can identify other ways that these problems could have been addressed. That's not what we're concerned with. We're concerned with whether or not the contender was taking steps to comply, even if they were not the most effective. That comes down to a question of willfulness. That's your argument, right? Yes. Yes, Your Honor. I have no further questions. That's all. Thank you. We'll take the case under advisement. We have other cases on the call. We'll take a recess.